UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| J.A., | Case No.  20-cv-07142-VKD |
| Plaintiff, | **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| KILOLO KIJAKAZI, | |
| Defendant. | Re: Dkt. Nos. 20, 22 |

Plaintiff J.A. [1] appeals a final decision of the Commissioner of Social Security ("Commissioner") [2] denying his application for supplemental security income under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381, *et seq.*[3]  J.A. contends the ALJ erred in four respects.  First, J.A. contends that the ALJ erred in improperly evaluating the medical opinions.  Second, J.A. contends the ALJ erred in improperly evaluating the "Paragraph C" criteria at step three of the sequential analysis.  Third, J.A. contends that the ALJ erred in concluding that jobs

---

[1] Because orders of the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by his initials.  This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).

[2] Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi, Acting Commissioner of Social Security, is substituted as defendant in place of Andrew Saul.

[3] J.A. originally filed applications for both disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, respectively. Administrative Record ("AR"), Dkt. No. 17, at 163, 167.  However, J.A. was not eligible for DIB benefits under Title II, and, as such, that application was denied at the administrative level for failure to meet the required insured status.  AR 176.  Accordingly, the decision of the administrative law judge ("ALJ") now appealed pertains only to J.A.'s application for SSI benefits under Title XVI.

existed at step five based on the Medical-Vocational Rules, without consulting a vocational expert. Finally, J.A. contends the ALJ erred assessing his residual functional capacity ("RFC").

The parties have filed cross-motions for summary judgment. The matter was submitted without oral argument. Upon consideration of the moving and responding papers and the relevant evidence of record, for the reasons set forth below, the Court grants J.A.'s motion for summary judgment, denies the Commissioner's cross-motion for summary judgment, and remands this matter for further administrative proceedings consistent with this order.[4]

## I.      BACKGROUND

J.A. filed an application for supplemental security income in February 2016, when he was thirty-seven years-old, alleging that he had been disabled since March 27, 2013, due to mental illness, psychosis, chronic knee pain, mobility pain, high blood pressure, and asthma. AR 15, 163-175, 206. J.A. subsequently amended his alleged onset date to February 18, 2016. AR 15, 270.

J.A.'s applications were denied initially and on reconsideration. AR 15, 81, 97. An ALJ held a hearing and subsequently issued an unfavorable decision on March 19, 2019. AR 15-25, 31-60. The ALJ found that J.A., who has a high school education and was in special education throughout school in all subjects, had not engaged in substantial gainful activity since his alleged onset date of February 18, 2016. AR 17, 56. He further found that J.A. has the following severe impairments: sprains, schizophrenia, and organic brain syndrome. AR 17. However, the ALJ concluded that J.A. does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in the Commissioner's regulations. *Id.*

The ALJ determined that J.A. has the RFC to perform medium work with the following limitation: "avoidance of concentrated exposure to respiratory irritants such as fumes, dusts, gases and poor ventilation." AR 20. The ALJ further limited J.A. to "simple routine tasks equating to unskilled work." AR 20. The ALJ then found that J.A. did not have any past relevant work, but

---

[4] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 2, 9.

1    that he is able to perform "unskilled work" that requires "the ability to understand, carry out and

2    remember simple instructions." AR 25.  Accordingly, the ALJ concluded that J.A. was not

3    disabled, as defined by the Act, from his alleged onset date of February 18, 2016, through the date

4    of the decision, August 9, 2019.  AR 25.

5         The Appeals Council denied J.A.'s request for review of the ALJ's decision.  AR 1-6.  J.A.

6    then filed the present action seeking judicial review of the decision denying her applications for

7    benefits.

8    **II.    LEGAL STANDARD**

9         Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's

10   decision to deny benefits.  The Commissioner's decision will be disturbed only if it is not

11   supported by substantial evidence or if it is based upon the application of improper legal

12   standards.  *Ahearn v. Saul*, 988 F.3d 1111, 1115 (9th Cir. 2021) (citation omitted); *Morgan v.*

13   *Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999) (citation omitted).  In this context,

14   the term "substantial evidence" means "more than a mere scintilla" but "less than a

15   preponderance" and is "such relevant evidence as a reasonable mind might accept as adequate to

16   support a conclusion." *Ahearn*, 988 F.3d at 1115 (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148,

17   1154 (2019) and *Molina v. Astrue*, 674 F.3d 1104, 1110-11 (9th Cir. 2012), *superseded by*

18   *regulation on other grounds* (internal quotation marks omitted)); *see also Morgan*, 169 F.3d at

19   599 (citation omitted).  When determining whether substantial evidence exists to support the

20   Commissioner's decision, the Court examines the administrative record as a whole, considering

21   adverse as well as supporting evidence. *Ahearn*, 988 F.3d at 1115 (citation omitted); *Hammock v.*

22   *Bowen*, 879 F.2d 498, 501 (9th Cir. 1989).  Where evidence exists to support more than one

23   rational interpretation, the Court must defer to the decision of the Commissioner. *Ahearn*, 988

24   F.3d at 1115-16 (citation omitted); *Morgan*, 169 F.3d at 599 (citation omitted).

25   **III.    DISCUSSION**

26        **A.    ALJ's Treatment of Medical Opinions**

27        J.A. presents three challenges to the ALJ's treatment of the medical opinions as follows:

28   (1)  the ALJ erred in failing to accord specific weight to all of the medical opinions on file; (2) the

United States District Court

Northern District of California

3

ALJ erred in evaluating the RFC opinion of Juliene Schrick, a licensed clinical social worker; and (3) the ALJ erred by ignoring entirely psychologist Dr. Bob Kennedy's RFC opinion.

### 1.      Medical Evidence and Opinions

J.A. began using drugs, including methamphetamine, cocaine, and alcohol, in 1994, at age twenty-five after his father died.  AR 378, 384.  J.A.'s history includes several periods of incarceration that were often drug-related, several years of homelessness, and suicide attempts.  AR 378, 330.  He was diagnosed with drug-induced psychosis in 2010, and was hospitalized for psychiatric reasons twice that same year.  AR 390.  In November 2013, after a prior attempt at drug rehabilitation, J.A. began substance abuse and mental health treatment at Sausal Creek Outpatient Stabilization in Oakland, California, where he was diagnosed with bipolar disorder and amphetamine abuse.  AR 376-409, 379, 388.  Except for one relapse in 2014, J.A. has been clean and sober since November 2013.  AR 321, 329.

In June 2014, J.A. moved into Grupo de Alcoholicos Dos de Febrero ("group home"), a sober living environment and twelve-step program in Oakland, California, where he was still living at the time of the 2018 ALJ hearing.  AR 37, 345, 414, 495.  Around the same time in 2014, J.A. commenced outpatient mental health treatment at La Clinica Casa Del Sol ("Casa del Sol") in Oakland, California.  AR 310.

From June 2014 through his September 2018 hearing, with the exception of hospitalizations in 2014 and 2015 for paranoid schizophrenia, J.A. received all of his mental health care from Casa del Sol clinicians, including from psychiatrists, psychologists, and licensed clinical social workers.  AR 306-375, 412-523.  The record reveals that J.A. was regularly seen—often multiple times per month—by psychiatrist Dr. Wendy Bernstein, psychologists Dr. Christian Lozano, Dr. Susanna Moore, and Dr. Kristin Good, and therapists Grace Pacheco, MFT, Heather Ladov, LCSW, Gina Fahouri, MFT, and Juliene Schrick, LCSW.  *See, e.g.,* AR 313-317, 325-26, 329-32, 335-37, 338, 457-65.  J.A.'s progress notes, reassessment reports, and treatment plans were routinely conducted and signed by multiple clinicians and doctors.  *See* AR 314-17, 333, 337, 349, 464.

In 2014, Casa del Sol clinicians diagnosed J.A. with functionally significant paranoia,

delusions, hallucinations, and significant functional impairment.  AR 324, 329-32.  Soon after he

began residing at the group home, in October 2014, J.A. was placed on an involuntary psychiatric

hold.  AR 290.  A Casa del Sol therapist noted in November 2014 that although J.A. was "clean

and sober," he was suffering from auditory hallucinations and paranoid perceptions, and that his

GAF score was only 48.[5]  AR 321-22.

     J.A. continued to suffer from serious, debilitating psychosis in 2015 and early 2016.  He

was again hospitalized twice for paranoid hallucinations in 2015, and he reported that he had not

been taking his medications.  AR 295.  In October 2015, Casa del Sol physicians, Drs. Lozano and

Moore, stated that "[d]ue to the nature of symptoms[, J.A.] exhibits difficulties being employed

and/or engaging in social activities without having conflicts."  AR 326.  The physicians noted that

J.A.'s auditory and visual delusions "impair[ed] his daily functional skills and activities."  AR

326.  Even though J.A. was able to control some of the symptoms with "medication adherence,"

he "continue[d] to struggle with . . . delusional patterns of thinking."  AR 326.  That same month,

psychiatrist Dr. Bernstein noted that J.A. suffered from impaired attention, judgment, and insight.

AR 333.  In the first half of 2016, Casa del Sol clinicians noted that J.A.'s hygiene was poor and

that he was suffering from "health-care related delusions" that had prevented him from getting

necessary medical and dental care.  AR 335-36.  They reported that J.A.'s "neglect of personal

health prevents him from gaining stable employment."  AR 336.

     Beginning in summer 2016, J.A.'s mental condition showed signs of stabilizing, and the

delusions and hallucinations subsided.  AR 341, 347, 343, 345.  Around the same time, in

September 2016, Dr. Sokely Khoi examined J.A. and issued the first RFC opinion regarding his

---

[5] The GAF is a scale "ranging from zero to 100, used to rate social, occupational and
psychological functioning on a hypothetical continuum of mental health."  Carolyn A. Kubitschek
& Jon C. Dubin, Social Security Disability Law and Procedure in Federal Court § 5:30 (Feb.
2022).  It is a subjective rating of an individual's overall psychological functioning, which may
assist an ALJ in assessing a claimant's mental RFC.  *Id.*  While a GAF score may help an ALJ
assess mental residual functional capacity, it is not raw medical data.  *Id.*  "Under the GAF scale,
people with GAF scores of 41 to 50 have 'serious symptoms . . . or a serious impairment in social,
occupational or school functioning (e.g.. . . unable to keep a job).'"  *Id.* (citing American
Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (Fourth Ed.
Rev. 2000)).

United States District Court
Northern District of California

1    mental and cognitive limitations.  AR 295.

2        Subsequently, in October 2016, Casa del Sol clinicians assessed J.A.'s GAF at 55.[6]  AR

3    349.  They noted that he continued to "suffer from psychosis," AR 358, but reported that J.A.

4    hoped to move out of the group home.  AR 360.  In November 2016, Dr. Bernstein noted J.A.'s

5    improvement but stated that she was "a little concerned that he could relapse on drugs if he

6    doesn't continue [twelve] step programs after he leaves sober living environment."  AR 369.

7        In January 2017, state agency consulting psychologist, Dr. Salib, reviewed J.A.'s medical

8    records and submitted an RFC opinion.  AR 91-93.  In August 2017, examining psychologist, Dr.

9    Bob Kennedy, also provided an RFC opinion.  AR 410-11.

10       Soon after, in fall 2017, J.A.'s mental health again deteriorated.  AR 523, 454, 457-65,

11   466-70.  J.A. began missing appointments with his therapist and psychiatrist.  AR 523, 451.  In

12   October and November 2017, he reported to his therapists and psychiatrist that he was

13   overwhelmed with hallucinations and was hearing voices daily "throughout the day" and that he

14   believed "they [were] from a Bluetooth installed in his head."  AR 454, 523.  He told them he had

15   thought about going to get his gun "to be done with it," and later confided that he had "two pistols,

16   a rifle, and an AK 47 in storage."  AR 517, 442.  In November 2017, J.A. told Ms. Schrick that the

17   voices in his head could be attributed to "police wiretapping and witchcraft."  AR 516.  In

18   treatment notes from this time, clinicians Ladov and Fahouri stated:

19        [J.A.'s] symptoms prevent him from working (he is currently in the process of
20        applying for disability), following through on appointments (it has taken him one
         year to get requested lab work completed) and following through on housing
21        referrals ([J.A.] is currently at risk of homelessness as he is being asked to leave the
         room in which he is staying.)   [J.A.] is currently reporting increased auditory
22        hallucinations and delusions.

23   AR 458.

24       As for J.A.'s group home, clinicians Ladov and Fahouri, along with Dr. Bernstein, noted

25   that J.A.'s "living situation is tenuous, [J.A.] has been asked to leave several times and has been

26   there much longer tha[n] he anticipated."  AR 466.  In terms of his day-to-day functioning, they

27

28   _____
     [6]A GAF score of 51 to 60 indicates "moderate difficulty in functioning."  *Id.*

United States District Court
Northern District of California

noted that, J.A. "struggle[d] with completing daily activities, including hygiene, medical appointments, taking his medication at times." AR 466. Dr. Bernstein explained, "[d]ue to psychotic symptoms, [J.A.] is often unable to follow through with appointments as he is disorganized and dysregulated." AR 467.

Dr. Bernstein increased J.A.'s medication dosage, and J.A. showed improvement by mid-November 2017. AR 443, 512. In 2018, J.A.'s hallucinations improved, but he continued to have some difficulty with his memory, was observed to be "cognitively slow," and he again began missing appointments. AR 420, 530, 426-28, 484. Dr. Good tried to help him with his calendaring and transportation, and provided him with a bus schedule, bus tickets, and a highlighted bus route. AR 502. His therapist, Ms. Schrick, observed low mood, flat affect, healthcare anxiety, and lack of motivation from April through July 2018. AR 493, 495, 484. J.A. again told Ms. Schrick and Dr. Bernstein that he wanted to move out of the group home and look for new housing. AR 530, 93.

In August 2018, weeks before his ALJ hearing, J.A. missed several appointments with his psychiatrist. AR 418. A Casa del Sol therapist went to J.A.'s group home, observed that he "present[ed] with disorganized thoughts," and brought him to Casa del Sol for his appointment that day with Dr. Bernstein. AR 480, 414. During that appointment, Dr. Bernstein reported that J.A.'s attention was impaired and that he had trouble remembering recent events. AR 414. She stated that J.A. "require[d] medication management to maintain stability in the community." AR 414.

J.A. testified at his September 2018 hearing that he continued to live in the same group home, where there is all-day supervision, and that he continued treatment with the Casa del Sol clinicians. AR 37, 47-48. He stated that he continues to hear voices sometimes, even with his medications, and that he gets paranoid and "freaks out" when there are a lot of people around. AR 43-46. He typically hears voices when he is paranoid. AR 46.

Approximately two weeks after J.A.'s hearing, on September 18, 2018, Ms. Schrick submitted an RFC opinion on J.A.'s behalf—the most recent RFC opinion on file. AR 524-29.

United States District Court
Northern District of California

7

United States District Court
Northern District of California

### 2.    ALJ's Failure to Specify Weight of Medical Opinions

J.A. argues that the ALJ erred when he failed to accord specific weight to *any* of the medical opinions on file, instead simply evaluating whether the opinion was "consistent" with the record.   In support, J.A. notes that consistency is only one of many factors required in evaluating medical opinions.  In response, the Commissioner argues that although "the ALJ did not specifically articulate the term 'weight,'" the "decision could not be more clear" regarding the weight the ALJ intended to give the medical opinions.  Dkt. No. 22 at 6.  The Court disagrees.

Regarding J.A.'s physical impairments, the ALJ found consultative examiner Dr. Rana's opinion "generally consistent with the record as a whole," and additionally found the state agency consultants' opinions "consistent with the record."  AR 22.  The ALJ assessed the medical opinions concerning J.A.'s mental impairments in the same manner.  He found psychological consultative examiner Dr. Khoi's opinion "generally consistent with the record," and similarly found the state agency psychological consultative examiner's opinion "generally consistent with the record."  AR 23.  The ALJ, however, concluded that Ms. Schrick's RFC opinion was inconsistent with the record.  The ALJ did not specify the weight he gave any of these opinions.  AR 22-24.

The Commissioner's rules and regulations regarding the evaluation of medical evidence were revised in March 2017 and apply to claims filed on or after March 27, 2017.  *See* 20 C.F.R. § 404.1520c.  For claims filed before March 27, 2017, the rules in 20 C.F.R. § 404.1527 apply.  *Id.*  Because J.A.'s claims were filed before March 27, 2017, the Court applies the rules then in effect under 20 C.F.R. § 404.1527.

For claims filed before March 27, 2017, each of the three types of medical opinions— treating, examining, and non-examining—is accorded different weight.  20 C.F.R. §§ 404.1527, 416.927.  Generally, more weight is given to the opinion of a treating physician than to the opinion of a physician who did not treat the claimant.  *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  Medical opinions and conclusions of treating physicians are accorded special weight because these physicians are in a unique position to evaluate the nature and extent of a claimant's conditions or impairments.  *See Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.

1988); *see also Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) ("A treating physician's opinion is entitled to 'substantial weight.'"); *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987)) (This court "afford[s] greater weight to a treating physician's opinion because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'").

When an ALJ gives a treating physician's opinion less than controlling weight, and the opinion is not contradicted by another physician, the ALJ must provide "clear and convincing" reasons for rejecting or discounting the opinion, supported by substantial evidence. *Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017). When a treating physician's opinion is contradicted by another physician, an ALJ must provide "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion, supported by substantial evidence. *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes*, 881 F.2d at 751 (quotations and citation omitted).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *See Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). As with the opinion of a treating physician, the ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician, and if the opinion is contradicted, the ALJ can reject the opinion only for specific and legitimate reasons that are supported by substantial evidence in the record. *Id.*; *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

The ALJ must consider all medical opinions in accordance with several factors, including the length of the treatment relationship and the frequency of examination, the opinion's supportability, the opinion's consistency, and the physician's specialization, if any. *See Garrison*, 759 F.3d at 1012; *Revels v. Berryhill*, 874 F.3d 648, 655 (9th Cir. 2017) (citing 40 C.F.R. § 416.927(c)(2)-(6)). Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *Garrison*, 759 F.3d at 1012; *see also Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R.

§ 404.1527(b)).  Thus, an ALJ errs when he ignores or rejects an opinion by offering boilerplate language or assigns too little weight to an opinion without explanation for why another opinion is more persuasive.  *Garrison*, 759 F.3d at 1012-13.

Here, the ALJ's failure to specify the persuasive weight he gave each of the medical opinions cannot be considered harmless.  In failing to assign a particular weight to the opinions, the ALJ also failed to explain which portions of the opinions—and limitations contained therein—he found persuasive and adopted, and which he rejected, and why.  This is especially true of the opinions that the ALJ found were "generally consistent" but not fully consistent with the record, like the opinion of psychological consultative examiner Dr. Khoi.

In September 2016, Dr. Khoi examined J.A. and administered several cognitive and psychological tests.  AR 295.  She diagnosed J.A. with schizophrenia, a history of polysubstance disorder, and neurocognitive disorder.  AR 297.   The results of J.A.'s cognitive functioning tests placed him in the "extremely low" range.[7]  AR 297.  Dr. Khoi observed that J.A.'s effort was inconsistent and that he "tended to give up easily," and concluded that the test results should be interpreted "with caution."  AR 296.  Ultimately, Dr. Khoi found that J.A. "appear[ed] to have cognitive deficits."  AR 297.  In terms of J.A.'s "work-related abilities," Dr. Khoi concluded that J.A. possessed moderate to marked limitations in two areas, including his ability to follow or remember complex and detailed instructions, and in his ability to maintain adequate pace or persistence to perform complex tasks.  AR 298.  Dr. Khoi also found a moderate limitation in J.A.'s ability to adapt to changes in job routine.  AR 298.

The ALJ appears to have implicitly rejected Dr. Khoi's assessment of moderate to marked limitations in his RFC determination.  While acknowledging that Dr. Khoi's RFC opinion was "generally consistent with the record," the ALJ nevertheless failed to describe the weight he gave Dr. Khoi's limitations or why he ultimately rejected them in favor of the limitations stated in the

---

[7] During his mental status examination, J.A. was unable to correctly complete a "serial sevens" exercise that measured concentration, and he was similarly unable to spell "WORLD" backwards. AR 296.

January 2017 RFC opinion from state agency consulting psychologist Dr. Salib.[8]  AR 91-93; AR 23.

Nor did the ALJ explain his reasons for adopting Dr. Salib's less restrictive limitations. AR 23.  Rather, the ALJ simply stated that Dr. Salib's "assessment is consistent with the record as a whole based on the evidence and reasons discussed."  AR 23.  In the absence of further explanation, the ALJ's failure to ascribe a particular weight to Drs. Khoi's and Salib's opinions (as with all of the medical opinions), leaves the Court "with nothing to review to determine whether the error materially impacted the ALJ's ultimate decision."  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006) (finding that ALJ's failure to provide reasons for rejecting evidence did not constitute a harmless error ); *see also Sawyer v. Astrue*, 303 F. App'x 453, 455 (9th Cir. 2008) (reversing when ALJ failed to indicate weight given to medical opinions or incorporate their findings into RFC); *Saucedo v. Colvin*, No. CV 13-0799-JPR, 2014 WL 4407616, at *7–8 (C.D. Cal. Sept. 8, 2014) (ALJ's error was not harmless where it was unclear "whether and to what extent" he considered medical opinions and his statements "did not provide insight into his reasons" for dismissing or discounting the opinions).

The ALJ committed this same error with respect to each of the medical opinions.  Remand is thus warranted for the ALJ to consider and weigh the medical opinions, explicitly accept or reject the limitations contained therein, and provide adequate explanation(s) for why one medical opinion is more persuasive than another.  *See Garrison*, 759 F.3d at 1012.

### 3. ALJ's Treatment of Ms. Schrick's Opinion

J.A. specifically challenges the weight the ALJ gave Ms. Schrick's RFC opinion and his justifications for rejecting her views.

In September 2018, Ms. Schrick, a licensed clinical social worker and one of J.A.'s

---

[8] Dr. Salib opined that J.A. could perform "simple repetitive tasks," and determined that J.A. possessed moderate limitations in his ability to understand and remember detailed instructions, to carry out detailed instructions, to perform a normal workday and workweek without interruptions from psychologically based symptoms, and to respond appropriately to changes in the work setting.  AR 91-93.  Dr. Salib also found that J.A. had no limitations related to taking public transportation or in social interactions, both of which are contradicted by the longitudinal record. AR 93.

United States District Court
Northern District of California

therapists at Casa del Sol, submitted an RFC opinion on J.A.'s behalf.  AR 524-29.  Ms. Schrick's opinion is the most recent one on file and the only RFC opinion that is based on an assessment of J.A. after his mental health deteriorated in 2017.  In providing her RFC opinion, Ms. Schrick considered J.A.'s mid-2017 to 2018 medical records; Drs. Khoi, Salib, and Kennedy did not. [9]

Ms. Schrick noted that J.A. had improved since 2014, but that "he continues to experience significant limitations in his daily functioning."  AR 524.  According to Ms. Schrick, J.A.'s symptoms included, among others:  significant deficits in cognitive functioning and observable psychomotor agitation or retardation; difficulty concentrating or thinking; qualitative deficits in communication and social interaction; one or more somatic symptoms; and difficulties organizing tasks and in learning, disturbance in mood and behavior.  AR 525.

Ms. Schrick opined that J.A. possessed several marked limitations in his abilities to understand, remember, and apply information; to adapt or manage himself; and in his ability to interact with others.  AR 526-27.  She also found that J.A. possessed many marked limitations in his ability to concentrate, persist, or maintain pace.  AR 527.  Ms. Schrick further opined that J.A. would be absent from work four days per month or more due to his impairments, and that he would be off task more than thirty percent of the time.  AR 428.  Although J.A.'s symptoms may fluctuate over time, she asserted that "it is expected that [he] will be coping with them over the course of his life."  AR 528.

Finally, Ms. Schrick observed that J.A. suffered from "a [m]edically documented history of a neurocognitive disorder; a schizophrenia spectrum or other psychotic disorder; a depressive, bipolar, or related disorder. . . of at least [two] years' duration."  AR 529.  She further concluded that there was evidence of both:  (1) "[m]edical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and

---

[9] The opinions from examining psychologists Drs. Khoi and Kennedy were from September 2016 and August 2017, respectively.  AR 295, 410.  State agency psychological consultant Dr. Salib's opinion was from January 2017.  AR 91.  J.A.'s mental health deteriorated in the fall of 2017, and the pertinent medical records pertaining to that deterioration post-dated the RFC opinions from Drs. Khoi, Kennedy, and Salib, and therefore would not have been considered by those doctors in conjunction with the RFC limitations they proffered.  AR 523, 524, 457-65, 466-70.

United States District Court
Northern District of California

1    signs of [J.A.'s] mental disorder;" and (2) "[m]arginal adjustment, that is, [J.A.] has minimal

2    capacity to adapt to changes in his environment or to demands that are not already part of his daily

3    life."[10]  AR 529.

4    The ALJ did not indicate whether he considered Ms. Schrick an "acceptable medical

5    source," but simply found that her opinion was "inconsistent with the claimant's mental health

6    records, discussed above, which have shown generally good mental status examinations and

7    mostly controlled mental health symptoms with medications, as well as with the other assessments

8    of record."  AR 24.  The ALJ also did not cite to any specific record evidence in support of his

9    rejection of Ms. Schrick's opinion.  AR 24.  However, he observed that the moderate to marked

10   limitations that Ms. Schrick assessed "appear[ed] to be overly restrictive and based in large degree

11   on subjective allegations."  AR 24.

12   Only "acceptable medical sources" can be considered treating sources, whose opinions

13   may be entitled to controlling weight.  *See* 20 C.F.R. §§ 404.1527(d) and 416.927(d). [11]  Under the

14   regulations that apply to this case, a licensed clinical social worker is not an "acceptable medical

15   source," but is instead an "other" medical source.  *See id.* § 404.1513(d) & (d)(1) (eff. Sept. 3,

16   2013 to March 26, 2017) (noting that "[o]ther sources include, but are not limited to . . . [m]edical

17   sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians'

18   assistants, naturopaths, chiropractors, audiologists, and therapists)"); *see also* Social Security

19   Ruling ("SSR") 06-03, *Titles II and XVI: Considering Opinions and Other Evidence from Sources*

20   *Who Are Not "Acceptable Medical Sources" in Disability Claims*, 2006 WL 2329939, at *2

21   (2006) (explicitly noting that "licensed clinical social workers" constitute "[m]edical sources who

22   are not 'acceptable medical sources'").[12]  Nevertheless, "an ALJ must consider the opinions of

23

24   ---

[10] These particular findings, as contained in Ms. Schrick's RFC opinion, mirror the Paragraph C
criteria contained in the Listings for mental impairments, and are discussed below in the Court's
25   analysis of J.A.'s challenge to the ALJ's Paragraph C determination.  *See* 20 C.F.R. § Pt. 404,
Subpt. P, App. 1, Listing 12.00(G).

26   [11] For claims filed after March 27, 2017, the SSA no longer distinguishes between an "acceptable
medical source" and an "other medical source."  20 C.F.R. § 404.1520c.
27

28   [12] Social Security Rulings are binding on all SSA decisionmakers.  *See Heckler v. Edwards*, 465
U.S. 870, 873 n. 3 (1984); *Bray*, 554 F.3d at 1224 (holding that Social Security Rulings "do not

United States District Court
Northern District of California

1  medical providers who are not within the definition of 'acceptable medical sources;'" and "may

2  give less deference to 'other sources' only if the ALJ gives reasons germane to each witness for

3  doing so." *Revels*, 874 F.3d at 655 (citing *Molina*, 674 F.3d at 1111); *see also* 20 C.F.R.

4  § 404.1527(b), (f); SSR 06-03p, 2006 WL 2329939, at *3.

### a.    Weight Given Ms. Schrick's Opinion

6  J.A. argues that the ALJ should have considered Ms. Schrick as a treating source even

7  though she was a licensed clinical social worker.  He notes that her RFC opinion was the only one

8  provided by Casa del Sol, where J.A. had been treated between one and five times a month for

9  more than four years, since July 2014.  AR 524.  The Commissioner does not address this

10 argument except to assert that the ALJ properly found Ms. Schrick's opinion inconsistent with the

11 record.

12 A close review of the record suggests that the ALJ should have considered whether Ms.

13 Schrick's RFC opinion warrants the same weight as the opinion of a treating physician whose

14 opinion is entitled to greater weight than the opinions of non-treating medical sources.  Although a

15 licensed clinical social worker typically qualifies as an "other medical source," which by

16 definition is not considered a treating source, there are some circumstances under which an "other

17 source" opinion is given weight comparable to that of a treating source.  The pertinent regulation,

18 20 C.F.R. § 416.927(f)(1), provides that:

19   an opinion from a medical source who is not an acceptable medical source . . .  may
20   outweigh the medical opinion of a medical source who is an acceptable medical
     source . . .  if he or she has seen the individual more often . . . , has provided better
21   supporting evidence and a better explanation for the opinion, and the opinion is
     more consistent with the evidence as a whole.

22 In *Gomez v. Chater*, the Ninth Circuit held that an "other" medical source's opinion may be

23 considered an "acceptable medical source" opinion when the "other source" worked closely with

24

---

25 carry the 'force of law,' but they are binding on ALJs nonetheless").  SSR 06-03 was rescinded
26 following the 2017 revisions that eliminated the distinction between an "acceptable medical
   source" and an "other medical source," but the ruling applies here since J.A.'s claim was filed
27 before March 27, 2017.  *See* Soc. Sec. Rul. 06-03p, rescinded (82 Fed. Reg. 15263-01) but
   applicable to claims filed before March 27, 2017 (noting "rescission will be effective for claims
28 filed on or after March 27, 2017").

United States District Court
Northern District of California

United States District Court
Northern District of California

the physician and acted as an agent of the physician.  *See* 74 F.3d 967, 971 (9th Cir. 1996) (nurse

practitioner's opinion could "properly be considered as part" of the physician's opinion). [13]  The

*Gomez* decision was based in part on the Ninth Circuit's reading of 20 C.F.R. § 416.913(a)(6),

which at the time provided that "[a] report of an interdisciplinary team that contains the signature

of an acceptable medical source is also considered acceptable medical evidence."  74 F.3d at 971.

The Ninth Circuit acknowledged in *Gomez* that "[w]hile nowhere in the regulations is the term

'interdisciplinary team' expressly defined, a plain reading . . . indicates that a nurse practitioner

working in conjunction with a physician constitutes an acceptable medical source, while a nurse

practitioner working on his or her own does not."  *Id.*

    In 2000, the Social Security Administration repealed 20 C.F.R. § 416.913(a)(6) as

"redundant and somewhat misleading to provide that an interdisciplinary team report containing

the evaluation and signature of an acceptable source is such a source."  65 Fed. Reg. 34950–01,

34952 (July 3, 2000).  While the Ninth Circuit has not explicitly addressed the impact of the repeal

of 20 C.F.R. § 416.913(a)(6) on *Gomez*, it has continued to cite to *Gomez* and apply the rule stated

therein as a narrow exception to the "acceptable medical sources" definition contained in the

regulations.  *See, e.g., Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1234 (9th Cir. 2011)

("To the extent [the] nurse practitioner was working closely with, and under the supervision of

[the physician] her opinion is to be considered that of an acceptable medical source."); *Molina*,

674 F.3d at 1111 (declining to address *Gomez*' s continued applicability but affirming the ALJ's

decision not to consider the opinion of a physician's assistant as an acceptable medical source

because "the record [did] not show that she worked under a physician's close supervision");

*Britton v. Colvin*, 787 F.3d 1011, 1013 n.4 (9th Cir. 2015) (noting that "*Gomez* partially relied on

20 C.F.R. § 416.913(a)(6), which has been repealed," but that "we express no view on the validity

of *Gomez*"); *see also Nathan B. v. Saul,* No. 2:18-cv-01408-SB, 2019 WL 4884223, at *7 (D. Or.

---

[13] When *Gomez* was decided, nurse practitioners were still considered "other" sources under 20 C.F.R. §§ 404.1513(d) & (d)(1) and according to SSR 06-03.  However, pursuant to the 2017 revisions effective March 27, 2017, the governing regulations now include nurse practitioners as medical sources qualified to offer medical opinions.  20 C.F.R. § 404.1513(a)(2).  As noted, because J.A.'s claim was filed prior to March 27, 2017, the amended provisions do not apply here.

1   October 3, 2019) (quoting *Jill C. v. Berryhill*, No. 3:17-cv-01892-SI, 2018 WL 6308728, at *8 (D.

2   Or. Dec. 3, 2018)) (noting that "the Ninth Circuit has 'continued to cite *Gomez* and apply the

3   exception to the acceptable medical sources definition long after the repeal of § 416.913(a)(6)'").

4   In fact, the Ninth Circuit observed that the *Gomez* decision only "relied in part on language" from

5   20 C.F.R. § 416.913(a)(6), thus suggesting that *Gomez* remains good law.  *Molina*, 674 F.3d at

6   1111 n.3.

7          Accordingly, most district courts continue to apply *Gomez*, recognizing, however, that the

8   revision to § 416.913 underscores the "narrow scope of the exception created by the Ninth Circuit

9   in *Gomez*."  *Mack v. Astrue*, 918 F. Supp. 2d 975, 982–84 (N.D. Cal. 2013) (citing numerous

10  district court cases from the Ninth Circuit); *see also Nathan B.*, 2019 WL 4884223, at *7 (citations

11  omitted) (noting that "[c]ourts have therefore held that *Gomez* continues to set forth the law of the

12  Ninth Circuit").

13         Here, Ms. Schrick was the clinic's supervising clinician, and during the course of J.A.'s

14  treatment, she filled in for J.A.'s other clinicians when they were unavailable.  AR 497-98.  Over

15  the course of more than four years, Ms. Schrick met personally with J.A. at least eleven times,

16  including on a near-weekly basis from April 2018 until his ALJ hearing in September 2018.  *See*

17  AR 456, 516, 498, 495, 493, 491, 488, 477.  Notably, Ms. Schrick worked closely with J.A. during

18  a period of mental health deterioration in 2017, assisting him in drawing up a "safety plan."  AR

19  456, 516.  She accompanied J.A. to medical appointments, including a visit to his primary care

20  physician when he feared having his blood drawn.  AR 491.

21         It also appears from the record that Ms. Schrick's RFC opinion was based not only on her

22  own direct mental health services provided to J.A., but also on the treatment notes of the Casa del

23  Sol clinicians and physicians who also treated J.A.  *See* AR 524 (noting that opinion was based on

24  "history [and] medical file," "progress and office notes," "psychological evaluations and

25  reports/opinions," and "consultative medical opinions" in addition to Ms. Schrick's "direct mental

26  health services provided to [J.A.]").  Ms. Schrick signed the RFC opinion in her capacity as the

27  Casa del Sol "clinical supervisor."  AR 529.  In sum, the record reflects that:  (1) Ms. Schrick

28  worked at the same mental health clinic with numerous "acceptable medical sources" including

United States District Court
Northern District of California

1    Drs. Bernstein, Lozano, Moore, and Good; (2) she personally treated J.A. at least eleven times;

2    (3) Dr. Bernstein personally treated J.A. more than fifteen times, and Dr. Lozano treated J.A.

3    several times in 2015; (4) Ms. Schrick and Dr. Bernstein cross-referenced J.A.'s visits and

4    absences; and (5) the Casa del Sol therapists and physicians worked together closely as a team.

5         Under these circumstances, the ALJ should have considered whether Ms. Schrick's RFC

6    opinion was entitled to the same weight as a treating "acceptable medical source" under 20 C.F.R.

7    § 416.927(f)(1) and *Gomez.*

8               **b.**       **ALJ's Reasons for Discounting Ms. Schrick's Opinion**

9         The ALJ's reasons for rejecting Ms. Schrick's opinion were nevertheless insufficient

10   regardless of whether she is considered a treating source.   Even if Ms. Schrick's opinion is not

11   entitled to the same deference as treating medical sources, the ALJ was, at a minimum, required to

12   provide "germane" reasons for discounting or rejecting her opinion, which he did not do.  *See*

13   *Revels*, 874 F.3d at 655 (citing *Molina*, 674 F.3d at 1111) ("While [other source] opinions are not

14   entitled to the same deference, an ALJ may give less deference to 'other sources' only if the ALJ

15   gives reasons germane to each witness for doing so.").

16        The opinions of social workers "are important and should be evaluated on key issues such

17   as impairment severity and functional effects, along with the other relevant evidence in the file."

18   SSR 06-03P, 2006 WL 2329939, at *3; *see also Garrison*, 759 F.3d at 1013–14 (other sources

19   "can provide evidence about the severity of a claimant's impairment(s) and how it affects the

20   claimant's ability to work").   "The same factors used to evaluate the opinions of medical providers

21   who are acceptable medical sources are used to evaluate the opinions of those who are not."  *Id*.

22   "Those factors include the length of the treatment relationship and the frequency of examination,

23   the nature and extent of the treatment relationship, supportability, consistency with the record, and

24   specialization of the doctor."  *Revels,* 874 F.3d at 655 (citing 20 C.F.R. § 404.1527(c)(2)–(6)).

25        As with all of the medical opinions on file, the ALJ focused exclusively on the

26   "consistency" of Ms. Schrick's opinion with the record, and failed to address several additional

27   relevant factors, including the length and frequency of her treatment relationship with J.A., the

28

United States District Court
Northern District of California

17

1    supportability of her opinion, and her specialization.[14]  *See Revels,* 874 F.3d at 655; *see also*

2    *Swales v. Saul*, 852 F. App'x 253, 256 (9th Cir. 2021) (remanding where ALJ failed to consider

3    factors pertaining to nurse practitioner who was not considered an acceptable medical source at the

4    time of claimant's application); *DeVries v. Comm'r of Soc. Sec.*, No. 18-CV-02824-VKD, 2019

5    WL 4839991, at *8 (N.D. Cal. Sept. 30, 2019) (remanding where it was not clear that the ALJ

6    considered all of the relevant factors, or if she did, how and to what extent those factors led to her

7    decision to give the nurse practitioner's  opinion little weight).

8         Moreover, the limited reasons that the ALJ gave for rejecting Ms. Schrick's opinion were

9    not sufficiently "germane" or supported by substantial evidence.[15]  The ALJ first noted that Ms.

10   Schrick's opinion was based "in large degree on subjective allegations."  AR 24.  However, as

11   discussed above, the ALJ's characterization is inaccurate.  Instead, Ms. Schrick's opinion was

12   based on more than four years of treatment records and opinions.  *See* AR 524 (noting that opinion

13   was based on "history [and] medical file," "progress and office notes," "psychological evaluations

14   and reports/opinions," and "consultative medical opinions" in addition to Ms. Schrick's "direct

15   mental health services provided to [J.A.]").  The medical evidence that Ms. Schrick's opinion

16   relied upon may have itself captured some self-reporting by J.A., but it also incorporated years of

17   treatment notes, testing results, medication management, and the opinions of J.A.'s therapists,

18   psychologists, and psychiatrists.  Regardless, the Ninth Circuit has recognized that where a mental

19   health provider relies in part on the claimant's self-reported symptoms but also relies on other

20   objective evidence, it is error for the ALJ to reject the provider's opinion based on the premise that

21

22   ────────────────────

[14] The Court rejects the Commissioner's suggestion that the ALJ was not required to discuss the
23   specific factors because the ALJ's "discussion of the evidence" somehow "otherwise ensure[d]"
     that "a claimant or reviewer [could] follow the [ALJ's] reasoning."  Dkt. No. 22 at 6 (citing 20
24   C.F.R. § 404.1527(f)(2)) ("The adjudicator generally should explain the weight given to opinions
     from these sources *or otherwise ensure* that the discussion of the evidence in the determination or
25   decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when
     such opinions may have an effect on the outcome of the case.") (emphasis added).  Nowhere in the
26   decision did the ALJ "otherwise" reveal his findings regarding the length and frequency of Ms.
     Schrick's treatment relationship with J.A., the supportability of her opinion, or her specialization.

27   [15] Since they were not "germane," they also were not "specific and legitimate" as required to reject
28   the opinion of a treating medical source.  *See Trevizo*, 871 F.3d at 675.

the claimant's self-reporting is unreliable.  *See Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) (noting that psychiatric "[d]iagnoses will always depend in part on the patient's self-report").

The ALJ also reasoned that the restrictive limitations in Ms. Schrick's RFC opinion were inconsistent with "J.A.'s mental health treatment records . . . which have shown generally good mental status examinations and controlled mental health symptoms with medications."  AR 24.  Other than to refer to the discussion "above," the ALJ did not provide any citations in support of his characterization of J.A.'s mental health treatment records.[16]  AR 24.  Notably, in his preceding discussion of the medical evidence, the ALJ found that "although [J.A.] has had some waxing and waning of symptoms, his mental health treatment records indicate that his symptoms are generally well-controlled with medications."  AR 22.

While the longitudinal record indeed demonstrates that medications have helped J.A. manage the severity of his symptoms, the record also reveals that the severity of his symptoms fluctuated over time.  In other words, J.A. experienced stable periods followed by a re-emergence of severe symptoms, which then required his treating therapists and doctors to alter and/or change the medications that he was taking.  *See, e.g.,* AR 445-47 (Dr. Bernstein changed J.A.'s medications in November 2017 following "worsening auditory hallucinations").  In support of his statement that J.A.'s symptoms were well-controlled by medications, the ALJ appears to have selectively cited to medical records from summer 2016, which marked a period of improvement in J.A.'s symptoms.  *See* AR 341 (July 2016 progress notes from J.A.'s meeting with licensed clinical social worker, Ms. Ladov, in which Ms. Ladov noted that J.A. was doing well); AR 348 (August 2016 notes from psychiatrist Dr. Bernstein that J.A. "increasingly stable" and "does not express delusions around body image").  J.A.'s medical records show that his symptoms generally

---

[16] The Commissioner counters with a number of additional *post-hoc* citations to the record.  *See* Dkt. No. 22 at 4.  However, these reasons were not cited by the ALJ and cannot properly be considered here.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (stating that the court "review[s] only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on a ground upon which he did not rely").

United States District Court
Northern District of California

were stable from approximately mid-2016 until mid-2017; however, they again deteriorated in mid- to late 2017.  *See* AR 341, 347, 343, 345, 523, 454, 457-64, 466-70, 523, 516-17.  The "near normal" mental examination records that the ALJ cites to are also from the stable period and are very different from the records from other less stable periods.  AR 22 (citing AR 345, 354-55, 368); *see, e.g.,* AR 22, 348 (citing to August 2016 exam with Dr. Bernstein at which the psychiatrist observed that J.A. had "good hygiene"); *but see* AR 335-36 (Drs. Bernstein and therapists Ms. Pacheco and Ms. Ladov note in April 2016 that J.A.'s hygiene was poor due to "healthcare delusions" and that his "neglect of personal health prevents him from gaining stable employment").

Moreover, although the ALJ acknowledged J.A.'s increase in symptoms in 2017, he nevertheless downplayed the severity of those symptoms and the degree to which medications prevented symptom reemergence.  AR 22.  The longitudinal evidence actually demonstrates that the severity of J.A.'s symptoms fluctuated even at times when he was taking medications.  For example, treating psychologist Dr. Lozano specifically noted in October 2015 that "[a]lthough with medication adherence [J.A.] demonstrates control of symptoms of psychosis, [J.A.] continues to struggle with interpersonal relationships and emotional regulation and 'delusional patterns of thinking.'"  AR 326.  Additionally, in a treatment plan signed by Dr. Bernstein and therapists Ms. Ladov and Ms. Fahouri from October 2016, during a stable period for J.A., the treatment plan acknowledged that in spite of years of sobriety and medication adherence, J.A. continued to suffer from "psychosis symptoms" that included auditory hallucinations, visual hallucinations, paranoia, anxiety, and dysregulation of emotion, which "impair [J.A.'s] daily functional skills and activities."  AR 356, 362.

Because review of the record demonstrates that the severity of J.A.'s symptoms waxed and waned over the years, the ALJ erred in discounting Ms. Schrick's RFC opinion based on a selective view of the longitudinal record.  *See Garrison*, 759 F.3d at 1017 (ALJ may not simply "pick out a few isolated instances of improvement over a period of months or years" but must interpret "reports of 'improvement' . . .  with an understanding of the patient's overall well-being and the nature of her symptoms."); *Ghanim v. Colvin*, 763 F.3d 1154, 1162 (9th Cir. 2014)(ALJ

should take "holistic review of the record" in evaluating medical opinions); *see also Alvarado v. Berryhill,* No. CV 16-7207 AJW, 2017 WL 3730830, at *6–7 (C.D. Cal. Aug. 29, 2017) (ALJ's conclusion that nurse practitioner's opinion was inconsistent because plaintiff "responded to medications" was not a germane reason for rejecting her opinion where the record did not "permit a reasonable inference that plaintiff exhibited sustained improvement in response to medications").

For all of these reasons, the Court concludes that the ALJ did not provide sufficient reasons for rejecting Ms. Schrick's RFC opinion.

### 4.    Dr. Kennedy's Opinion

In August 2017, Dr. Kennedy, a psychologist with the Alameda County Social Services Agency, evaluated J.A. for the purpose of assessing his disability for the county. AR 410-11. Dr. Kennedy opined that J.A.'s mental health condition prevented him from working and that the condition was persistent such that he would not be able to work for twelve months or more. AR 411. In addition to many moderate limitations, Dr. Kennedy assessed J.A. with a marked limitation in his ability to maintain attention for extended periods of time. AR 410.

J.A. argues that the ALJ erred when he ignored Dr. Kennedy's RFC opinion. The Commissioner concedes that the ALJ failed to discuss Dr. Kennedy's opinion, but argues that this error was harmless. According to the Commissioner, Dr. Kennedy's opinion is consistent with Ms. Schrick's, and the Court should assume that the ALJ's reasons for rejecting Ms. Schrick's opinion apply equally to Dr. Kennedy's opinion. In reply, J.A. points out that Dr. Kennedy is an "acceptable medical source," and, as such, the consistency of his opinion with Ms. Schrick's means that *both* opinions are entitled to greater weight.

The Court agrees that the ALJ erred in ignoring Dr. Kennedy's opinion, and that the error cannot be considered harmless. *Garrison*, 759 F.3d at 1012–13 (citing *Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996)) (An ALJ's failure to address and explicitly credit or reject a medical opinion is a legal error.). J.A. is correct that Dr. Kennedy constitutes an "acceptable medical source," and his opinion is consistent with that of Ms. Schrick, which the Court has already concluded the ALJ erred in rejecting. Moreover, the combined weight of Ms. Schrick's opinion and Dr. Kennedy's opinion could have impacted the ALJ's RFC determination had he

21

1   properly considered both opinions.

2   **B.      ALJ's Step Three Paragraph "C" Determination**

3         J.A. argues that the ALJ failed to adequately articulate the reasons for his determination

4   regarding the Paragraph C criteria at step three of his sequential analysis.  In support, J.A. notes

5   that he has suffered from serious and persistent mental health conditions for more than two years,

6   with records dating back to 2013.  Dkt. No. 20 at 16-17.  He further notes that at the time of the

7   hearing, he had lived in a structured sober living environment for five years and had received

8   extensive services from Casa del Sol since 2014, including therapy and medication management

9   support, psychosocial support, and rehabilitation services.  *Id.* at 16-17.  For the reasons set forth

10  below, the Court agrees that the ALJ erred in evaluating the Paragraph C criteria.

11        At the third step of the sequential analysis, the ALJ must determine whether the claimant's

12  impairment or combination of impairments meets or is medically equivalent to a listed impairment

13  so as to preclude substantial gainful activity.  *Ghanim*, 763 F.3d at 1160; *see also Kennedy v.*

14  *Colvin*, 738 F.3d 1172, 1175 (9th Cir. 2013).  For mental impairments, in order to meet the

15  severity of a listed impairment, the claimant can either satisfy the "Paragraph B criteria," or, if

16  applicable, the "Paragraph C criteria."  *Herbert L. v. Kijakazi,* 20-cv-06779-SVK, 2021 WL

17  4924767, at *4 (N.D. Cal. Aug. 11, 2021) (discussing 20 C.F.R. Part 404, Subpart P, Appendix 1).

18  Where, as here, the ALJ determines that a claimant fails to satisfy the Paragraph B criteria, some

19  mental impairments also have alternative Paragraph C criteria that can be met instead of the

20  Paragraph B criteria.  *Id.*, Listing 12.00(G)(1).  To satisfy Paragraph C, a mental disorder must be

21  "serious and persistent," that is, there is a medically documented history of a listed disorder over a

22  period of at least two years and the disorder satisfies both the C1 and C2 criteria.  Listings

23  § 12.00(G)(2)(a); *see also Craig N. v. Saul*, No. 19-CV-05235-TSH, 2020 WL 4284845, at *21

24  (N.D. Cal. July 27, 2020) (discussing Paragraph C).

25        The C1 criteria are satisfied with evidence that a claimant relies, on an ongoing basis, on

26  medical treatment, mental health therapy, psychological support, or a highly structured setting to

27  diminish signs and symptoms of the disorder.  Listings, § 12.00(G)(2)(b).  The C2 criteria are

28  satisfied with evidence that, despite diminished symptoms and signs, the claimant achieved only

United States District Court
Northern District of California

United States District Court
Northern District of California

"marginal adjustment," meaning the claimant has minimal capacity to adapt to changes in his

environment or to demands that are already party of daily life. *Id.* § 12.00(G)(2)(c) ("Marginal

adjustment means that [a claimant's] adaptation to the requirements of daily life is fragile."). It is

found "when changes or increased demands have led to exacerbation of claimant's symptoms and

signs and to deterioration in functioning." *Needham v. Berryhill*, No. 18-CV-04183-PJH, 2019

WL 5626641, at *18 (N.D. Cal. Oct. 31, 2019) (discussing Listings § 12.00(G)(2)(c)).

Here, at step three, the ALJ considered Listings 12.02 (neurocognitive disorders), 12.03

(schizophrenia spectrum and other psychotic disorders), and 12.04 (depressive, bipolar and related

disorders). AR 18. The ALJ first considered Paragraph B, discussing J.A.'s mental health

treatment records from 2015 to 2018. AR 18-19. After concluding that the Paragraph B criteria

were not met, the ALJ then summarily determined that the Paragraph C1 and C2 criteria were not

met either, stating simply that:

> The evidence fails to establish the presence of the 'paragraph C' criteria of Listing
> Sections 12.02, 12.03, 12.04 or any other section because the medical evidence does
> not demonstrate the requisite medical treatment, mental health therapy, psychosocial
> supports or a highly structured setting that diminishes the symptoms and signs of the
> claimant's mental disorder, with the claimant only achieving marginal adjustment.

AR 20. The ALJ further noted that "[a]lthough the claimant has been living in a sober residential

home, the evidence discussed below does not demonstrate that he has only achieved marginal

adjustment." AR 20. In sum, other than the observation that J.A.'s continued residence at the

group home failed to show "marginal adjustment"—a component of the C2 criteria—the ALJ

failed to explain which of the C1 and C2 criteria were not met, and why.[17]

The ALJ's failure to explain his Paragraph C determination again leaves the Court to guess

why the longitudinal record did not suffice to satisfy C1 and C2. *See Needham*, 2019 WL

5626641, at *18–19 (finding the ALJ's Paragraph C analysis insufficient because it was unclear as

to which part of the Paragraph C analysis its prior discussion of the medical evidence applied);

*T.M. v. Kijakazi*, No. 20-CV-05164-NC, 2021 WL 6882389, at *3 (N.D. Cal. Aug. 2, 2021)

---

[17] Again, the Commissioner responds with *post hoc* reasons from the record to support the ALJ's
conclusion, which the Court may not consider. *See Orn*, 495 F.3d at 630.

United States District Court
Northern District of California

(concluding that ALJ's singular statement that claimant did not meet Paragraph C because he lived with roommates and "there [was] no evidence he require[d] a structured living arrangement" was insufficient and did not constitute substantial evidence); *Plas v. Comm'r of Soc. Sec. Admin.,* No. CV 20-00286-TUC-DCB-LAB, 2021 WL 3668380, at *1 (D. Ariz. June 22, 2021) (reversing and remanding where ALJ's findings regarding the plaintiff's "normal mental status with minimal treatment" constituted insufficient explanation for why plaintiff did not satisfy the C2 criteria given the record evidence otherwise).  Here, the Court's review of the medical evidence suggests that had the ALJ engaged in a meaningful discussion of the criteria, C1 likely would have been satisfied given the frequent, ongoing treatment and therapy J.A. received at Casa del Sol over many years and the Casa del Sol medical records and opinions that demonstrate that J.A. relied on those services and the support of his group home to "diminish signs and symptoms of [his] disorder."  Listings, § 12.00(G)(2)(b); *see*, *e.g.,* AR 333 (October 2015 reassessment signed by Drs. Lozano, Moore, and Bernstein stating that J.A. was "in need [of] continuous case management, therapeutic support and medication in order to get the support he needs" and that he "will meet weekly with Christian Lozano, PsyD, and monthly with Dr. [Wendy] Bernstein for psychiatric services"); AR 458 (November 2017 assessment notes from clinicians Ladov and Fahouri noting that J.A.'s "symptoms prevent him from working (he is currently in the process of applying for disability), following through on appointments (it has taken him one year to get requested lab work completed) and following through on housing referrals ([he] is currently at risk of homelessness as he is being asked to leave the room in which he is staying)").

        Similarly, the Court's review of the record also suggests that meaningful inquiry into the C2 criteria likely would have resulted in a finding that J.A.'s residence at the group home, along with several additional factors, constituted "marginal adjustment."  For example, as discussed above, J.A. experienced periods of deterioration that required changes to his medication and treatment.  *See* AR 414 (August 2018 appointment note from Dr. Bernstein that J.A. "requires medication management to maintain stability in the community"); AR 445 (November 2017 appointment note from Dr. Bernstein stating that J.A. required medication changes in light of his worsening and re-emerging symptoms).  Additionally, the record suggests that J.A. may be

United States District Court
Northern District of California

1    "unable to function outside of . . . [the]  more restrictive setting of his group home" given that he

2    repeatedly expressed a desire over the years to secure alternate living arrangements but was

3    unsuccessful attaining this goal.  20 C.F.R. Pt. 404, Subpt. P, App. 1; *see* AR 466 (Dr. Bernstein

4    and therapists Ladov and Fahouri note in November 2017 that J.A.'s living situation was

5    "tenuous" and that he had been asked to leave several times, and had, in fact, wanted to leave a

6    long time ago); AR 369 (Dr. Bernstein notes in November 2016 that she has concerns if J.A.

7    leaves his sober living environment).

8         Because the ALJ failed to adequately explain his Paragraph C determination, it was

9    therefore not supported by substantial evidence.

10   **C.       ALJ's Step Five Determination**

11        At step five of the sequential analysis, the ALJ relied exclusively on "the grids," namely

12   Medical-Vocational Rule 203.28, in determining that, given J.A.'s RFC, there were jobs in the

13   economy that J.A. could perform.[18]  AR 24-25.  J.A. argues the ALJ erred in relying solely on the

14   grids given that he possesses substantial non-exertional limitations related to his cognitive and

15   mental health impairments, including those set forth in the RFC opinions of Drs. Khoi and

16   Kennedy and Ms. Schrick, discussed above, and the environmental limitations identified by state

17   agency medical consultant Dr. Lee, and included by the ALJ in his RFC determination.  The

18   Commissioner counters that the ALJ was entitled to rely on the grids based on Social Security

19   Ruling 85-15 and the Ninth Circuit's decision in *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir.

20   2007).  Dkt. No. 22 at 10-11.

21        As noted, in terms of J.A.'s mental and cognitive impairments, at step four, the ALJ

22   rejected the restrictive non-exertional limitations suggested by Ms. Schrick that J.A. possessed

23   *several* marked limitations in his abilities to understand, remember, and apply information; to

---

25   [18] The grids "present, in table form, a short-hand method for determining the availability and
     numbers of suitable jobs for a claimant." *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114-15 (9th

26   Cir. 2006) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1101 (9th Cir. 1999)).  They consist of three
     tables, for sedentary work, light work, and medium work, and a claimant's place on the applicable

27   table depends on a matrix of four factors: a claimant's age, education, previous work experience,
     and physical ability.  *Id.*  "For each combination of these factors, [the grids] direct a finding of

28   either 'disabled' or 'not disabled' based on the number of jobs in the national economy in that
     category of physical-exertional requirements."  *Id.*

adapt or manage himself; and in his ability to interact with others; and that J.A. possessed *many* marked limitations in his ability to concentrate, persist, or maintain pace.  AR 527 (emphasis added).  The ALJ also implicitly rejected Dr. Khoi's opinion that J.A. possessed moderate to marked limitations in his ability to follow or remember complex and detailed instructions, and in his ability to maintain adequate pace or persistence to perform complex tasks.  AR 298.  Finally, the ALJ ignored Dr. Kennedy's opinion that J.A. had a marked limitation in his ability to maintain attention for extended periods of time.  AR 410.  Instead, the ALJ adopted the state agency consulting psychologist's opinion that J.A. was limited to simple repetitive work based on his mental and cognitive impairments. AR 20, 22-24.  Additionally, the ALJ adopted a non-exertional limitation related to J.A.'s asthma, specifying that he "avoid[] concentrated exposure to respiratory irritants such as fumes, dusts, gases and poor ventilation."  AR 20, 22 (noting that "even though [the ALJ] found [J.A.'s] asthma to be non-severe, [he] added asthma precautions" to the RFC finding).[19]  AR 22.

At step five, the ALJ subsequently found that J.A.'s non-exertional limitations had "little or no effect" on his ability to perform "unskilled medium work."  AR 24.  The ALJ noted J.A.'s environmental limitation but relied on SSR 85-15 to conclude that the limitation's impact "would be minimal because most job environments do not involve great amounts of irritants."  AR 25 (citing SSR 85-15, *Capability to Do Other Work: The Medical-Vocational Rules As A Framework for Evaluating Solely Nonexertional Impairments*, 1985 WL 56857 (1985)).  The only additional non-exertional impact that the ALJ discussed was J.A.'s limitation "in terms of interacting with others."  AR 25.  The ALJ suggested that J.A. possessed only a mild limitation in this area, but nevertheless asserted that J.A. would still not be disabled "even if [he] had more than mild limitations in terms of interacting with others." AR 25.  The ALJ reasoned that SSR 85-15 "states that unskilled work ordinarily involves dealing primarily with objects, rather than with data or people."  AR 25.  The ALJ, however, failed to mention any other non-exertional limitations at step five, including those identified by Dr. Khoi, Dr. Kennedy, and Ms. Schrick.

---

[19] This limitation mirrored that set forth in Dr. Lee's RFC opinion.  AR 76.

United States District Court
Northern District of California

At step five, the government has the burden of demonstrating that other work exists in significant numbers given a claimant's RFC, education, age, and work experience. 20 C.F.R. §§ 416.912(f); 416.960(c).  The Commissioner can meet the burden of demonstrating appropriate jobs in "significant numbers" in one of two ways.  *Tackett*, 180 F.3d at 1101.  The ALJ can either hear the testimony of a vocational expert ("VE") or can refer to the Medical–Vocational Guidelines (commonly known as "the grids") found at 20 C.F.R. Pt. 404, subpt. P, app. 2.  *Id.*

The grids "are a matrix system for handling claims that involve substantially uniform levels of impairment." *Tackett*, 180 F.3d 1094, 1101 (9th Cir. 1999) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2).  The efficiency of the grids justifies the ALJ's use thereof, as opposed to a VE, only when the grids "*completely and accurately* represent a claimant's limitations." *Id.* (emphasis in original). "In other words, a claimant must be able to perform the full range of jobs in a given category, i.e., sedentary work, light work, or medium work." *Id.*

There are circumstances, however, when an ALJ may not use the grids.  For example, "significant non-exertional impairments, such as poor vision or inability to tolerate dust or gases may make reliance on the grids inappropriate." *Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573, 577 (9th Cir. 1988).  A mere allegation of a non-exertional limitation does not automatically preclude application of the grids, though, and should not allow a claimant to make an end run around the more efficient grids evaluation. *Id.*  Instead, "the grids are inapplicable '[w]hen a claimant's non-exertional limitations are sufficiently severe so as to significantly limit the range of work permitted by the claimant's exertional limitations.'" *Hoopai*, 499 F.3d at 1075 (alteration in original) (internal quotation marks omitted) (quoting *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988)).  However, "the severity of limitations at step five that would require use of a vocational expert must be greater than the severity of impairments determined at step two, otherwise the two steps would collapse and a vocational expert would be required in every case in which a step-two determination of severity is made." *Id.* (citing *Heckler*, 461 U.S. at 461).

As discussed above, the ALJ erred in weighing the medical opinion evidence, including discounting treating clinician Ms. Schrick's opinion and ignoring Dr. Kennedy's opinion.

1    Additionally, as discussed in more detail below, the ALJ's assessment of J.A.'s RFC was,

2    therefore, tainted by those errors and was not supported by substantial evidence.  These errors, in

3    turn, also tainted the ALJ's determination at step five as to whether J.A.'s non-exertional

4    limitations were "sufficiently severe so as to significantly limit the range of work permitted by the

5    claimant's exertional limitations."  *Young v. Saul*, No. 19-CV-01965-PJH, 2020 WL 3506805, at

6    *27–29 (N.D. Cal. June 29, 2020) (discussing *Hoopai*, 499 F.3d at 1075).

7         Here, a revised RFC that properly takes into account Ms. Schrick's and Dr. Kennedy's

8    opinions would almost certainly result in non-exertional limitations that are sufficiently severe to

9    necessitate VE testimony.  *Id.*  The Commissioner's reliance on *Hoopai* is therefore misplaced.

10   499 F.3d at 1071.  First, unlike *Hoopai*, J.A.'s mental impairment is not "mild or moderate

11   depression" but undisputed schizophrenia and psychosis.  *See Pennington v. Colvin*, No. EDCV

12   14-1747-KLS, 2015 WL 13237440, at *4 (C.D. Cal. Sept. 11, 2015) (noting that "the analysis in

13   *Hoopai* centered on whether the claimant's 'mild or moderate depression' was 'a sufficiently

14   severe non-exertional limitation that significantly limit[ed] a claimant's ability to do work beyond

15   the exertional limitation'"); *see also Samuels v. Comm'r of Soc. Sec.*, No. 18-CV-01872-VKD,

16   2019 WL 4479534, at *15 (N.D. Cal. Sept. 18, 2019) (concluding that *Hoopai* was inapposite

17   where plaintiff suffered from schizophrenia and his doctors "assessed moderate or marked

18   limitations on [plaintiff's] functional abilities that the ALJ, without proper explanation,

19   disregarded").  Moreover, unlike the claimant in *Hoopai*, who received only limited treatment for

20   his depression, J.A. has undergone near continual treatment for schizophrenia since 2013.

21        Social Security Ruling 85-15, relied on by the ALJ, does not suggest a different result with

22   respect to J.A.'s mental impairments.  AR 24-25.  That ruling states that, "[t]he basic mental

23   demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis)

24   to understand, carry out, and remember simple instructions; to respond appropriately to

25   supervision, coworkers, and usual work situations; and to deal with changes in a routine work

26   setting."  SSR 85-15, 1985 WL 56857, at *4.  The ruling further recognizes, that where a claimant

27   possesses "no exertional impairment, unskilled jobs at all levels of exertion constitute the potential

28   occupational base for persons who can meet the mental demands of unskilled work."  *Id.*

United States District Court
Northern District of California

1        The ALJ properly recognized that SSR 85-15 advises that "[unskilled] jobs ordinarily

2   involve dealing primarily with objects, rather than with data or people, and they generally provide

3   substantial vocational opportunity for persons with solely mental impairments." *Id.*; AR 25.

4   However, the ALJ failed to meaningfully consider whether J.A. "retain[ed] the capacity to meet

5   the intellectual and emotional demands of such [unskilled] jobs on a sustained basis," as required

6   by SSR 85-15. *Id.* (emphasis added).   Indeed, the ruling explicitly recognizes that "[a] substantial

7   loss of ability to meet any of the[] basic work-related activities would severely limit the potential

8   occupational base . . . [and] justify a finding of disability because even favorable age, education,

9   or work experience will not offset such a severely limited occupational base." *Id.*

10        Accordingly, given the significant non-exertional limitations pertaining to J.A.'s mental

11   and cognitive impairments, it was error for the ALJ to rely solely on the grids. *See Fluker v.*

12   *Berryhill,* No. 16-CV-01472-JCS, 2017 WL 4340354, at *31–32 (N.D. Cal. Sept. 29, 2017)

13   (concluding that the plaintiff's non-exertional impairments related to his PTSD and major

14   depression rendered "the ALJ's sole reliance on the grids inappropriate").   On remand, in addition

15   to re-evaluating J.A.'s RFC and reweighing the medical opinion evidence, the ALJ must obtain

16   testimony from a vocational expert, who can consider the record evidence concerning J.A.'s non-

17   exertional limitations and opine whether work exists in significant numbers given J.A.'s RFC,

18   education, age, and work experience. *See Martins v. Astrue*, No. EDCV 10-06732 SS, 2011 WL

19   2601839, at *6–7 (C.D. Cal. July 1, 2011) (remanding for ALJ to call a VE after concluding that

20   ALJ erred in relying on grids without the assistance of a VE where claimant possessed multiple

21   moderate non-exertional limitations related to his mental impairments, including one that

22   necessitated limited interactions with the public).

23        Additionally, on remand, the ALJ should reconsider whether the non-exertional

24   environmental limitation related to J.A.'s asthma also requires VE testimony.[20]   Social Security

25   Ruling 85-15 recognizes that, typically, "[w]here a person has a medical restriction to avoid

26

27   ───────────────

28   [20] Environmental limitations are non-exertional, as opposed to exertional, impairments. *See* SSR
    85-15, 1985 WL 56857, at *2 ("A nonexertional impairment is one which is medically
    determinable and causes a nonexertional limitation of function or *an environmental restriction*.").

*excessive* amounts of noise, dust, etc., the impact on the broad world of work would be minimal because most job environments do not involve great noise, amounts of dust, etc." SSR 85-15, 1985 WL 56857, at *8 (emphasis added). By contrast, "[w]here an individual can tolerate *very little* noise, dust, etc., the impact on the ability to work would be considerable because very few job environments are entirely free of irritants, pollutants, and other potentially damaging conditions." *Id.* (emphasis added). The ruling states that it is the middle ground—when "the environmental restriction falls between very little and excessive"—that "generally require[s]" the services of a VE. SSR 85-15, 1985 WL 56857, at *8.

Here, J.A.'s environmental limitation is to avoid "concentrated exposure." AR 20. It is unclear to the Court how "concentrated exposure" compares with "excessive exposure," as referenced in SSR 85-15. If they are the same, then the environmental limitation did not require consultation with a VE. However, if "concentrated exposure" represents a middle ground between "excessive" and "very little" exposure, VE testimony likely is necessary. Accordingly, on remand, the ALJ must also consider where J.A.'s environmental limitation falls on the spectrum referenced by SSR 85-15, and whether VE testimony is warranted regarding the environmental limitation as well.

### D.     ALJ's RFC Determination

An ALJ assesses a claimant's RFC "based on all the relevant evidence in [the] case record." 20 C.F.R. § 416.945(a)(1). The ALJ must consider both the medical evidence and "descriptions and observations of [the claimant's] limitations from [the claimant's] impairment(s), including limitations that result from [the claimant's] symptoms, such as pain, provided by" the claimant, family, friends, and other people. *Id.* § 416.945(a)(3).

As discussed above, the Court concludes that the ALJ erred in several respects, including: (1) in weighing the medical opinion evidence, and, in particular, by discounting J.A.'s treating clinician Ms. Schrick's opinion and ignoring Dr. Kennedy's opinion; (2) in his failure to explain why the record does not show that J.A. possessed a "serious and persistent" mental disorder that satisfied the Paragraph C1 and C2 criteria; and (3) in failing to call a VE to testify regarding whether work exists in significant numbers given J.A.'s non-exertional limitations related to his

1   mental and cognitive impairments.

2          The ALJ's assessment of J.A.'s RFC was, therefore, tainted by these errors and was not

3   supported by substantial evidence.  Accordingly, on remand, the ALJ is required to reassess J.A.'s

4   RFC in accordance with the Court's rulings on the other issues above.

5   **IV.     DISPOSITION**

6          J.A. asks the Court to remand for payment of benefits. The Social Security Act permits

7   courts to affirm, modify, or reverse the Commissioner's decision "with or without remanding the

8   case for a rehearing." 42 U.S.C. § 405(g).  "[W]here the record has been developed fully and

9   further administrative proceedings would serve no useful purpose, the district court should remand

10  for an immediate award of benefits."  *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004).

11  However, "[r]emand for further proceedings is appropriate where there are outstanding issues that

12  must be resolved before a disability determination can be made, and it is not clear from the record

13  that the ALJ would be required to find the claimant disabled if all the evidence were properly

14  evaluated." *Luther v. Berryhill*, 891 F.3d 872, 877–78 (9th Cir. 2018) (citations omitted).

15         It is not clear from the record that the ALJ would be required to find J.A. disabled if all the

16  evidence were properly evaluated.  Therefore, remand is appropriate.  As discussed above, on

17  remand, the ALJ must reconsider: (1) the persuasiveness of the medical opinions; (2) the

18  Paragraph C criteria; and (3) J.A.'s RFC.  Additionally, at step five, the ALJ should call a VE to

19  testify regarding whether work exists in significant numbers given J.A.'s non-exertional

20  limitations related to his mental and cognitive impairments, and should consider also whether VE

21  testimony is required regarding J.A.'s environmental non-exertional limitation.

22  **V.      CONCLUSION**

23         Based on the foregoing, J.A.'s motion for summary judgment is granted, the

24  Commissioner's motion for summary judgment is denied, and this matter is remanded for further

25  proceedings consistent with this order.  The Clerk shall enter judgment accordingly and close this

26  ///

27  ///

28  ///

United States District Court
Northern District of California

file.

     **IT IS SO ORDERED.**

Dated: June 16, 2022

VIRGINIA K. DEMARCHI
United States Magistrate Judge

United States District Court
Northern District of California